Date signed January 18, 2012



PAUL MANNES
U. S. BANKRUPTCY JUDGE

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### at Greenbelt

IN RE:                     :
                           :
SERGIO G. BIONDO         :      Case No. 09-32192PM
                           :            Chapter 13
              Debtor          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - :

### MEMORANDUM OF DECISION

        This case comes before the court on several contested matters between Debtor and the OAS Staff Federal Credit Union (the "Credit Union") involving entitlement to various funds arising from Debtor's employment with the Organization of American States ("OAS"), which terminated during this Chapter 13 case. The matters taken under advisement and addressed herein consist of the Credit Union's Motion To Vacate Automatic Stay As To Debtor and Debtor's Estate Re: [Funds in the amount of $134,512.91; 2005 BMW 330xi] (D.E. No. 34) (the "Lift Stay Motion"); Debtor's Motion For Turnover of Property (D.E. No. 40) (the "Turnover Motion"); and the Credit Union's Objection To Debtor's Amended Claim of Exemptions (D.E. No. 53) (the "Objection To Exemptions"). At all pertinent times, Debtor was the holder of a G-4 visa and not subject to United States income tax. While this hearing involved the Credit Union and Debtor, another beneficiary of Debtor's efforts could be the Chapter 13 Trustee acting on behalf of all unsecured creditors. Debtor submits that were he to prevail, funds now in the hands of the Credit Union would be available for distribution pursuant to Debtor's confirmed plan.

## FACTS

Debtor, an Argentine national, filed a Chapter 13 petition on November 16, 2009, due to problems described as resulting from a divorce.  At that time, according to his Schedule of Current Income, he was a staff attorney employed by the OAS and had been so for 16 years.  In the Schedules of Assets filed with his petition, Debtor listed only some items of personal property having a total value of $22,569.00, which included a 2005 BMW 330xi worth $16,450.00.  His Schedules listed no real property interests or any interests in an IRA, ERISA, Keogh, or other pension or profit sharing plans.

In his Schedules of Liabilities, Debtor listed three undisputed claims held by the Credit Union:

(1)     On Schedule D, a claim described as "May, 2005 Purchase Money Security" in the amount of $19,925.00 secured by Debtor's 2005 BMW 330 XI (the "Car Loan");

(2)     On Schedule F, a claim described as "Opened 10/01/04 Last Active 6/11/09 line of credit" in the amount of $65,000.00 (the "LOC Loan"); and

(3)     On Schedule F, a claim described simply as "loan" in the amount of $106,394.82 (the "Closed End Loan").

Debtor's original Chapter 13 Plan, filed with his petition on November 16, 2009, provided for his payment of the Car Loan in full outside of the Plan. The Plan was silent as to the LOC Loan and the Closed End Loan.  On December 22, 2009, the Credit Union objected to this Plan, alleging that it failed properly to treat the LOC Loan and the Closed End Loan as secured claims and asserting that,

(A)     the LOC Loan is secured by Debtor's "fully vested right, title and interest in the Retirement & Pension Fund of the Organization of American States, which has a value of not less than $642,418.55, and is evidenced by an Assignment, dated 12 Jun. 2009; and

(B)     that the Closed End Loan is secured by "a security interest in [Debtor's] termination benefits from the Organization of American States, which have a value of not less than $185,273.22 and is evidenced by an Assignment dated 12 Jun. 2009; and a security interest in his BMW 330xi . . . ."

2

The day before the hearing on the Credit Union's objection to confirmation of Debtor's Plan, on March 1, 2010, Debtor filed an Amended Schedule D changing the classification of the LOC Loan to that of a claim secured by "retirement benefits."  On the same date, Debtor filed an amended Chapter 13 Plan which added the LOC Loan to the Car Loan as secured claims to be paid outside of the Plan directly by Debtor.  There was no change in the Plan to the treatment and classification of the Closed End Loan.  The Amended Plan was confirmed on June 4, 2010, without further objection from the Credit Union.

On April 6, 2010, Credit Union counsel filed a fully executed Reaffirmation Agreement under which Debtor and the Credit Union agreed to reaffirmation of the LOC Loan in the amount of $65,000.00 based on a credit agreement described as "Advance Request Voucher and Security Agreement dated 3/18/02," secured by collateral described as "Retirement and Pension Fund of Organization of American States (Debtor's 100% wholly vested interest)," with a stated value of $642,418.55.  The Reaffirmation Agreement provides for "payments to continue until completion of Chapter 13 Plan; thereafter principal reduction and interest payments to resume per contract terms.  Total balance due and owing upon separation or retirement from Organization of American States."  The court issued its Statement of Review of the Reaffirmation Agreement on April 7, 2010.  Debtor did not exercise the right of rescission provided under 11 U.S.C. §524(c)(4).

The Credit Union filed the following proofs of claim :

(i)     No. 4, filed on December 12, 2009, in the sum of $65,224.34, the basis of which is stated as being "line of credit," the security for which is described as Debtor's "Retirement & Pension Fund of OAS (100% vested)" having a value of $642,418.55.  The court understands this claim to correspond to the LOC Loan scheduled by Debtor.  This claim was withdrawn without explanation on August 10, 2010.[1]

(ii)    No. 5, filed on December 12, 2009, in the sum of $126,488.38, the basis of which is stated as being "Closed End loan;" the security for which is described as "Termination benefits from OAS & 2005 BMW 330xi"

---

[1]At trial, the Credit Union's counsel stated that this claim was withdrawn because it had been satisfied.

having a value of $204,673.00; the basis for perfection being described as "UCC Sec 9-203 & NSIF [Maryland Motor Vehicle Administration Notice of Security Interest Filing];" and the amount of the secured component being stated as $126,488.38.  The court understands this claim to correspond to the Closed End Loan scheduled by Debtor, but classified by the Credit Union as being fully secured as opposed to Debtor's classification of the claim as being unsecured.

(iii)   The first amendment to Claim No. 5 filed on March 30, 2010, in the sum of $126,488.38, the basis of which is stated as being "Closed End loan;" the security for which is described as "Termination benefits from OAS & 2005 BMW 330xi" having a value of $204,673.00; the basis for perfection being described as "UCC Sec 9-203 & NSIF;" the amount of the secured component being stated as $20,000.00; and the amount of the unsecured component being stated as $106,488.38.

(iv)   No. 7, filed on January 6, 2010, in the sum of $2,867.00 described as a "share account overdraft."

(v)   No. 15, filed on August 24, 2010, in the sum of $126,488.38, the basis of which is stated as being "closed end loan;" the security for which is described as being "Termination benefits from OAS & 2005 BMW 330xi (Debtor terminated OAS employment July 31, 2010);" the basis for perfection being described as "UCC Sec 9-203 & NSIF"; and the amount of the secured component being stated as $126,488.38.  This claim was withdrawn and refiled on August 27, 2010, as a second amendment to Claim No. 5.

Debtor did not file an objection to any of these claims.

All was quiet following approval of the Reaffirmation Agreement and confirmation of Debtor's amended Chapter 13 plan until November 5, 2010, when the Credit Union filed a Motion to Vacate Automatic Stay.  The Credit Union alleged that,

10.   Termination benefits from OAS are payable as of right when an employee is separated from employment, and consist of expenses for repatriation to the employee's nation of origin, nine months of basic salary

4

and up to three months of accumulated leave.

        *      *      *

16.    On  31 Jul. 2010, Debtor's employment with OAS terminated, and he was repatriated to Argentina.  At that time, he was entitled to receive approximately $204,000 in termination benefits from OAS.

17.    For more than 40 years, OAS has honored assignments of termination benefits given as collateral for loans made by the Credit Union to employees of OAS.

18.    On or about 22 Sep. 2010, OAS notified the Credit Union that it would honor the Assignment, and instructed the Credit Union to submit an itemization of the total balance due on [the Closed End Loan] as of 24 Sep. 2010.

19.  In response, the Credit Union notified OAS that the payoff balance due on [the Closed End loan] as of 24 Sep. 2010 was $134,512.91, including interest and late charges.

20. On 24 Sep. 2010, OAS transmitted its check in the amount of $134,512.91 (the "Funds") to the Credit Union.  The Funds are being held in escrow pending the disposition of this motion.

21. On or about 25 Oct. 2010, Debtor delivered the keys to the Vehicle to the Credit Union.

(The termination benefits that are the subject of the Lift Stay Motion are hereinafter referred to as the "Termination Benefits.")

The Lift Stay Motion triggered the following filings by Debtor on November 18, 2010:

(1)    Amended Schedule B to add his interest in "retirement and pension benefits administered by Organization of American States" in the amount of $204,000.00 (the "Retirement Benefits").  On January 4, 2011, Debtor filed a Second Amended Schedule B changing the value of this interest to $612,131.90;

(2)    Amended Schedule C to claim an exemption for the Retirement Benefits pursuant to MD. CODE ANN., Cts. & Jud. Proc. §11-504(h).  On January 4, 2011, Debtor filed a Second Amended Schedule C changing the value of the exemption to $612,131.90 to comport with his second Amended Schedule B;

(3)    Amended Schedule F, adding the share account overdraft as an undisputed claim in the amount of $2,867.00, comporting with the Credit Union's proof of claim No. 7;

5

(5)      a Motion To Modify Plan (D.E. No. 39), in which Debtor stated,

>        The debtor's employment with the OAS terminated as of 7/31/10.
>        The debtor who is an international attorney has relocated to Buenos Aires,
>        Argentina. . . .
>
>                              *        *        *
>
>        The attached modified plan is designed to address the debtor's
>        current status and material change in his income stream while at the same
>        time offering creditors more than they would receive under a Chapter 7
>        liquidation.  Securing his retirement proceeds will allow the debtor to
>        plan funding in the amount of $42,700.00 which pays the allowed
>        unsecured claims approximately 17%;

offer

and

(6)      a Motion For Turnover of Property against the Credit Union alleging that the
Credit Union "has unlawfully attached and seized the debtor's retirement and
pension fund totaling approximately $134,512.91. . . .  The retirement and
pension fund earnings described herein constitute[] exempt property of the estate
as defined by 11 U.S.C. Section 541."

On December 7, 2010, the Credit Union filed an Objection To Debtor's Amended Claim
of Exemptions (D.E. No. 53), referring to Debtor's first amended Schedule C filed on November
18, 2010, asserting that, "Apparently, Debtor intended to claim the 'package' of termination and
separation benefits to be exempt under Md. Cts. & Jud. Proc. Art. §11-504(h)(1).  These monies
were NOT 'payable to a participant or beneficiary from, or any interest of any participant or
beneficiary in, a retirement plan qualified under the Internal Revenue Code,' as prescribed by
Md. Cts. & Jud. Proc. Art. §11-504(h)(1)."  On January 4, 2011, when Debtor amended his
Schedule C for a second time, changing the amount of his exemption of the Retirement Benefits
to $612,131.90, the Credit Union filed a Supplemental Objection, arguing that "the $612,131.90
distribution from the Pension Fund [was not] 'rolled over' into an IRS-qualified pension or
retirement account, but was converted into liquid funds," and therefore is not exempt.  (The
Credit Union's Objection To Debtor's Amended Claim of Exemptions and its Supplemental
Objection may be referred to hereinafter collectively as "Objection To Exemptions.")

A consolidated trial on the Lift Stay Motion, the Turnover Motion and the Objection To
Exemptions took place June 21, 2010.  Debtor did not attend the trial.  His counsel stated that he
had been "repatriated" to Argentina, could not obtain a visa, and that "the cost to come here is

rather prohibitive, but we're prepared to move forward in this matter." As such, the court received uncontradicted testimony from the following witnesses called by the Credit Union: Lucia Hughes, the Executive Vice President of the Credit Union; Carlos Calderon, the President and Chief Executive Officer of the Credit Union; Altamira Bhatt, an HR Specialist employed by the OAS; Caesar Perez, a Retirement and Pension Fund accountant employed by the OAS; and Alex Figuera, the General Secretary and Chief Financial Officer of the OAS. The Credit Union offered and the court admitted sixteen exhibits in the course of trial. Debtor's counsel offered no witnesses and introduced one exhibit - the Reaffirmation Agreement.

The Chapter 13 Trustee has not taken a position on any of the issues raised by the parties and did not participate in the trial.

Among the exhibits introduced by the Credit Union is a document entitled, "Open-End Voucher and Security Agreement", dated June 8, 2009 and bearing the signatures of Debtor and a representative of the Credit Union, Trial Exhibit 1 (the "Security Agreement"); and a document entitled "Assignment of Termination Benefits", bearing Debtor's signature and a date of June 12, 2009, accompanied by a document of even date entitled, "Terms for Loan Approval", also bearing Debtor's signature (collectively, (the "Assignment"), Trial Exhibit 2. The Terms for Loan Approval state a loan amount of $126,319.82 and "Collateral: Retiring Benefits, Car Title, Comaker." The Security Agreement also states a loan amount of $126,319.82.

## DISCUSSION

At the outset, the court finds that until the parties' relationship imploded in the Fall of 2010, they shifted their positions of record and took actions both in and outside of these proceedings without consistency and to suit their purposes. For example, the Credit Union shifted its position as to the secured amount of its claim arising from the Closed End Loan. In its original proof of claim, the Credit Union classified the claim as being fully secured by Debtor's termination benefits and his 2005 BMW. At a February 2, 2010, meeting between Debtor, Mr. Calderon, and Ms. Hughes, (1) Debtor assured the Credit Union that he would pay his loans to the Credit Union voluntarily regardless of the outcome of his bankruptcy proceeding, either through monthly payments or with his termination benefits, and (2) the Credit Union agreed to re-file its proof of claim for the Closed End Loan as partially unsecured. *See* Trial Transcript, pp. 21-24. Accordingly, on March 30, 2010, the Credit Union filed an amended proof of claim for the Closed End Loan, shifting the secured component of the claim down to $20,000 and the

7

unsecured component up to $106,488.38.  On August 27, 2010, after Debtor's termination, the Credit Union again amended this proof of claim, returning it to being fully secured as in the original.

Debtor, on the other hand, did not disclose the existence of the retirement benefits until he filed an Amended Schedule B on November 18, 2010, one year after commencement of this case.  The court suspects that his disclosure of retirement benefits at that time was only in reaction to the Credit Union's receipt of a check in payment of the Closed End Loan directly from the OAS.[2]  In his Turnover Motion, Debtor argues that the funds in the possession of the Credit Union are "retirement and pension fund earnings" and as such constitute exempt property of the estate.  The fact that a debtor may claim an exemption in property does not preclude the property from being used as collateral for a loan, or debtors would be filing bankruptcy in droves to avoid all deeds of trust on their homesteads and liens on their cars.  Moreover, the court finds Debtor's argument to be untenable as Debtor previously reaffirmed and acceded to payoff of the LOC Loan based on its being secured by his retirement funds.  The court rejects Debtor's argument that this type of property, *per se*, cannot be used to secure one debt when Debtor reaffirmed it as security for another.  Finally, in view of the court's inability to find that Debtor has scheduled the Termination Benefits, *see* Fn. 2, *supra*, the Turnover Motion must be denied in part as it does not go to property "that Debtor may exempt under section 522 of this title." *Cf.* 11 U.S.C. §542(a).

In his trial memoranda, Debtor argues that the Credit Union could not have received a security interest in the Termination Benefits at the time of the Closed End Loan because they did not yet exist.  First, DC CODE § 28:9(a)-204 allows as here that a security agreement may create or provide for a security interest in after-acquired collateral.  In addition, the Credit Union's uncontradicted evidence shows that an OAS employee enjoys certain termination benefit rights

---

[2]Debtor argues that his termination benefits are in the nature of retirement and pension benefits, but the value of the retirement benefits that he listed in his second amended Schedule B, $612,131.90, is the exact amount stated in the OAS Retirement and Pension Fund liquidation statement of Debtor's account as of August 9, 2010, Trial Exhibit 11, the breakdown of which does <u>not</u> include the termination benefits.  Accordingly, the court finds that Debtor has not scheduled his termination benefits.

from the commencement of employment, including payment for repatriation expenses, the equivalent of nine months of salary, and up to three months of accumulated leave.  The Debtor's own conduct belies his argument as well.  On May 5, 2009, prior to the commencement of this case, Debtor emailed Ms. Bhatt, an HR Specialist at the OAS, requesting a calculation of anticipated termination benefits and stating, "I'm considering the option of requesting a loan from the credit union and I want to present this information to them."  *See* Trial Transcript, pp. 50-53, Exhibit 5b.  In response, the office of the Secretary for Administration and Finance within the OAS generated a document entitled "PROFORMA LIQUIDATION" setting forth a calculation of Debtor's termination benefits as of May 7, 2009 (the "Pro Forma").  *See* Trial Exhibit 5a.  While the parties did not introduce into evidence any employment contract between Debtor and OAS, in the court's view, Debtor's request and the OAS' response demonstrate that Debtor had a legal interest in termination benefits at least as of May 7, 2009 - if not before - with the value being subject to calculation according to the actual date of termination.  Clearly Debtor regarded and held out his termination benefits as a valuable asset when applying for the Closed End Loan - long before actual termination of employment.  While the benefits may not be liquidated, and the value known, until the employee's actual termination, the court finds that Debtor's interest therein - such as it was - constituted property of the estate as of the commencement of this case within the broad definition of 11 U.S.C. §541(a).  Moreover, Debtor's interest therein became liquidated as of his termination on July 31, 2010, and the expanded definition of "property of the estate" provided under 11 U.S.C. §1306(a) renders the postpetition timing of Debtor's interest becoming liquidated irrelevant for purposes of the court's decision.

Debtor also argues that the Termination Benefits are the kind of property to which a security interest cannot attach based on § 9-109(d)(3) of the Uniform Commercial Code (the "UCC"), which provides that, "This [Article 9] does not apply to: . . . (3) an assignment of a claim for wages, salary, or other compensation of an employee."[3]  Debtor asserts that due to the

---

[3] Debtor, a resident of Maryland upon the commencement of the case, cites to Maryland's codification of the UCC, Md. Commercial Law Code Ann. §9-101 *et seq*. The Credit Union, organized under the laws of the District of Columbia ("D.C."), cites to D.C.'s codification of the UCC, DC Code 28:9-101 *et seq.*.  The court finds it unnecessary to determine which jurisdiction's law determines the applicability of Article 9 to the subject loan transaction as both

inapplicability of Article 9 to the Termination Benefits, no lien could have attached to them.  The court agrees that Article 9 is inapplicable, albeit for a different reason: the court has no evidence of the creation of a security interest in the Termination Benefits.  *See* § 9-109(a), which provides in pertinent part, "[This Article 9] applies to . . . a transaction, regardless of its form, that creates a security interest in personal property . . . by contract."  The contract between the parties, the Open-End Voucher and Security Agreement dated June 8, 2009, Trial Exhibit 1, is silent as to the Termination Benefits in the portion of the form where "Security Offered" must be listed.[4] The Assignment does not contain any language indicating an intent to create or provide for a security interest in the Termination Benefits or the retention of title in Debtor.  *Cf.* §9-102(a) ("'Security agreement' means an agreement that creates or provides for a security interest.") Based on the plain language of these documents, the court does not view the Closed End Loan as a secured transaction to which Article 9 applies.

The court's conclusion that Article 9 is inapplicable to the transaction giving rise to the Closed End Loan does not end the inquiry into the parties' rights with respect to the Termination Benefits.  On that question, the court finds the following language of the Assignment to be unequivocal and unambiguous:

> I, Sergio Biondo, . . . do hereby assign, transfer and set over to the Assignee all of my rights, including withdrawal rights, title and interest in all monies due the Assignor in the form of termination benefits of any kind from the Organization of American States . . . .

The quoted language covers all incidents of ownership of such property ("all of my rights, including withdrawal rights, title and interest"), and Debtor retains nothing except to the extent that there is a surplus after payment of the Loan.  The court finds that by the Assignment, Debtor effected an absolute transfer of his ownership of the Termination Benefits to the Credit Union; that Debtor communicated the Assignment to the OAS as it controlled the withdrawal and other rights he had assigned; and that Debtor intended the Assignment to be honored by the OAS in distributing his Termination Benefits if and when his employment terminated.  Debtor offered no

---

Maryland and DC have adopted identical versions of the provisions quoted above.

[4] Paragraph 1 of the Security Agreement provides, "By signing this security agreement . . . , you give us what is known as a security interest in the property described in the 'Security Offered' section on the reverse side."

evidence or argument as to why the Assignment should be construed in any other way, and his actions both before and during this case - until he elected to terminate his employment - demonstrate his intent that the Assignment be given its full force and effect.  The court finds nothing in the Bankruptcy Code precluding this result.

In its Lift Stay Motion, the Credit Union asserts that, "For more than 40 years, OAS has honored assignments of termination benefits given as collateral for loans made by the Credit Union to employees of OAS."  Ms. Hughes testified that for almost fifty years it has been the practice and procedure of the OAS to recognize assignments of termination benefits as collateral for loans made by the Credit Union, and that the Pro Forma, Trial Exhibit 5a, was used by Debtor to induce the Credit Union to make the Closed End Loan.  *See* Trial Transcript, pp. 24-25.  *See also* Testimony of Mr. Calderon, Trial Transcript p. 87, ll. 23-25 ("Yes, for over 40 years, close to 50 years we have had this agreement with the OAS where all of the loans are guarantied with the termination benefits.").  Given the fact that Debtor at one time was on the Supervisory Committee of the Credit Union and had served as a member and chair of the board of directors of the Credit Union, Trial Transcript p. 14, l. 23 - p. 15, l. 2, the court finds that Debtor knew the Assignment would be treated by the OAS exactly as it was.

Finally, the court is mindful of Debtor's argument that the body of unsecured creditors of the estate stand to win or lose based on the outcome of these matters, as the funds at issue could be used by the Chapter 13 Trustee to make the distributions proposed under Debtor's confirmed Plan.  The court does not see this decision as necessarily having that effect.  If Debtor would have his Termination Benefits be exempt but nonetheless available to his unsecured creditors, he can as easily use his exempted Retirement Benefits, which the OAS distributed to him by transfer dated August 9, 2010 in the amount of $612,131.90, Trial Exhibit 11a, for such purposes.

Based on the foregoing, the court finds that Debtor induced the Credit Union to make the Closed End Loan by giving it the Pro Forma, and outright assigned his interest in the Termination Benefits to the Credit Union to be applied to the outstanding balance of the Closed End Loan in the event of termination of employment.  The court declines to characterize the Assignment as a secured transaction, but rather views it as Debtor's absolute relinquishment of his right, title and interest in the Benefits as a guaranty of payment of the Closed End Loan.  The court also finds the OAS-Credit Union practice to be equitable considering the obvious

opportunity that an OAS employee would have to evade repayment of Credit Union loans by terminating employment and repatriating out of the Credit Union's reach.[5]

That being said, the court infers from the uncontroverted trial testimony that there are rights and obligations, and procedures for determining them, as between the OAS, its employees and the Credit Union. For example, the court takes notice of the Administrative Tribunal of the OAS under the OAS' published organizational chart; the published General Standards To Govern the Operations of the General Secretariat of the OAS; the published Statutes of the Tribunal; and the published Codified Regulations For the OAS Retirement and Pension Plan, which appear to be available to the parties for the resolution of their dispute.[6] Again, the court notes the Credit Union's testimonial evidence of an agreement with the OAS regarding the OAS' payment of a departing employee's obligations directly from benefit funds prior to any final distribution to the employee. This agreement appears to have been recognized by Debtor when he requested the Pro Forma on May 5, 2009.

For all of these reasons, the court will issue an order on the Lift Stay Motion and the Turnover Motion granting the parties relief to pursue their rights and remedies according to applicable nonbankruptcy law, without prejudice to Debtor's assertion of claims or defenses against the Credit Union. The Credit Union's Objection To Exemptions shall be sustained based on the court's finding that Debtor did not schedule or claim an exemption in the Termination Benefits.

cc:    Debtor
       Counsel to the Debtor
       Counsel to the OAS Staff Federal Credit Union
       Chapter 13 Trustee

---

[5]While the court does not find that such machinations were at play here, the court notes Mr. Perez's testimony that Debtor was not terminated involuntarily but had decided to take "the early buy out package." *See* Trial Transcript p. 79, ll. 11-16.

[6]While the parties rested their cases and the evidence closed at the conclusion of trial on June 21, 2011, the court notes the Credit Union's filing in this case on December 30, 2011 of a document entitled, "Judgment 155" under the letterhead of the OAS and the "LIX Regular Session of the Administrative Tribunal of the Organization of American States," dated December 27, 2011, referring to Complaint 292, *Sergio Biondo v. Secretary General of the Organization of American States*, which complaint was purportedly filed on May 19, 2011.

**End of Memorandum**